83 N.J. Super. 464 (1964)
200 A.2d 358
INDUCTOTHERM CORPORATION, A PENNSYLVANIA CORPORATION, PLAINTIFF,
v.
NEW JERSEY MANUFACTURERS CASUALTY INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 1, 1964.
*465 Mr. Kenneth J. Dawes for plaintiff (Messrs. Dawes & Dawes, attorneys).
Mr. Theodore W. Geiser for defendant (Messrs. Pindar, McElroy, Connell & Foley, attorneys).
BARLOW, J.C.C. (temporarily assigned).
In this action, tried by the court sitting without a jury, and in which the essential facts were not disputed, plaintiff Inductotherm Corporation seeks reimbursement for monies paid by it to *466 satisfy judgments entered against it in the State of Michigan, along with compensation for expenditures made by it in connection with defending the suits which resulted in such judgments, and counsel fees and expenses arising out of the instant case, alleging that a comprehensive public liability policy issued to it by defendant insured plaintiff against the accidents which formed the basis of the judgments entered against it and, further, obligated defendant to undertake the defense of the civil actions which produced the judgments.
Defendant declined to defend plaintiff against the claims originally asserted, or to pay the resultant judgments, on the ground that the policy in question specifically excluded coverage of the risk from which plaintiff's liability resulted.
On July 13, 1958, the defendant issued to plaintiff a comprehensive public liability policy in which it agreed as follows:
"To pay on behalf of the insured, all sums which the insured shall become legally obliged to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom sustained by any person and caused by accident."
With respect to the obligation to defend suits brought against the insured, the policy further provided:
"With respect to such insurance as is afforded by this policy, the company shall: (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; * * *."
The policy also contained an exclusion clause, as follows:
"It is agreed that the policy does not apply
1. to the products hazard as defined in the policy; * * *."
The term "products hazard" is defined in the policy as:
"(1) goods or products manufactured, handled, or distributed by the named insured * * * if the accident occurs after possession of such goods or products has been relinquished to others by the *467 named insured * * * and if such accident occurs away from the premises owned, rented, or controlled by the named insured * * *."
(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; * * *."
Thereafter, and during the period in which the policy was in effect, plaintiff leased an induction melting unit manufactured by it to Superior Kendrick Bearings, Inc., a Michigan corporation (hereinafter referred to as "Kendrick"), together with a number of ceramic crucibles to be used in conjunction with the induction melting unit.
On October 22 and 23, 1958 four of Kendrick's employees sustained injuries when certain of the crucibles supplied by plaintiff suffered bottom failures, splattering molten bronze on the floor of Kendrick's foundry, with the resultant injuries to its employees.
On April 2, 1959 plaintiff notified the defendant that it had been advised that the workmen's compensation carrier for Kendrick's employees had announced its intention to collect its costs and expenses, and that the injured employees had retained counsel with a view toward instituting civil actions against plaintiff for damages by reason of the injuries so sustained. Following receipt of notice of such claims, on May 5, 1959 defendant notified plaintiff that it had completed its investigation of the claims, and that in its opinion the claims concerned only "product's liability," for which claims its comprehensive liability policy afforded no coverage. Again, on May 7, 1959 plaintiff wrote to defendant conceding that even though the "product's liability" was not covered by the policy, it was concerned with an allegation contained in the complaint alleging negligence on the part of plaintiff by reason of its failure to "advise the customer of a hazard." Defendant replied on May 12, 1959, restating its original position, although in somewhat equivocal terms.
*468 Thereafter, in August 1959 four suits were instituted in the State of Michigan against plaintiff. The pleadings were immediately forwarded to defendant with the request that it defend such actions.
On August 26, 1959 defendant acknowledged receipt of the suits forwarded, but advised plaintiff of its determination not to undertake the defense. As a result of defendant's disclaimer, plaintiff was required to retain attorneys in Michigan to defend the cases.
The four complaints filed against the plaintiff herein were identical, consisting of three counts each, and charging the plaintiff here, Inductotherm Corporation, with negligence, setting forth in detail the acts or failures to act alleged to have constituted the negligence complained of.
During the pendency of the suits instituted in Michigan, plaintiff once again requested defendant to reconsider its position and undertake the defense of the cases. On February 16, 1960 defendant again declined to do so, advising plaintiff promptly, albeit cryptically, that "our opinion is unchanged and with regret we must await the outcome of this case before doing so."
The cases were consolidated and tried in Michigan, without a jury, in January 1963, and as a result the Circuit Court of Wayne County, Michigan, entered verdicts against Inductotherm Corporation in favor of the four plaintiffs, totalling $14,700, and a verdict for the workmen's compensation carrier, the Michigan Mutual Liability Company, in the sum of $2,391.76.
The court filed a written opinion which, after reciting the facts, included the following language:
"* * * It is the opinion of this court that the plaintiffs have proved by a preponderance of the evidence that the defendant was negligent, that such negligence was the proximate cause of the injury to the plaintiffs and that the defendant should be held liable for the injuries to the plaintiffs.
This rule is best stated in Comstock vs. General Motors Corporation, 358 Mich. 163 on Page 177 [99 N.W.2d 627, 78 A.L.R.2d 449] wherein Gerkin vs. Brown and Sehler Company [177 Mich. 45, 143 *469 N.W. 48, 48 L.R.A., N.S., 224] is quoted, and especially the last paragraph on said page which states: `If such duty to warn of a known danger exists at point of sale, we believe a like duty to give prompt warning exists when a latent defect which makes the product hazardous to life becomes known to the manufacturer shortly after the product has been put on the market. * * *"
On May 10, 1963 plaintiff paid the judgments, including costs, totalling $15,142, to the four employees of Kendrick; and on September 9, 1963 plaintiff also paid the sum of $2,391.76 to the Michigan Mutual Liability Company. In addition to satisfying the judgments as aforesaid, plaintiff was required to pay attorneys' fees to its Michigan counsel in the amount of $3,387.90, and claim additional expenses arising out of the defense of the case totalling $5,674.90, as well as other legal fees and expenses arising out of the instant case, in the amount of $5,000.
Here, plaintiff Inductotherm Corporation insists that the Michigan complaint alleged negligence on its part outside of the "product" involved; urging, in substance, that the negligence for which it was held to account was not negligence directly related to the "product" itself and therefore within the exclusionary language, but, rather  as expressed in the Michigan court's opinion  negligence arising out of its failure to "warn" Kendrick and its employees of an inherent defect in the "product" or of a danger arising out of the use of the "product," and that, accordingly, defendant was obliged to undertake the defense of the suits and to satisfy any judgment arising therefrom.
Defendant contends, however, that the injuries suffered by the Michigan employees resulted from an accident squarely within the meaning of the exclusionary clause in its policy; that its policy does not provide coverage of the accident which resulted in the institution of the lawsuits in Michigan, and that, therefore, it properly declined to defend the suits or pay the judgments.
The specific allegations contained in the complaints filed in Michigan by Kendrick's employees were predicated upon the *470 negligence of plaintiff and allege the following acts of negligence:
"(a) In failing to furnish the plaintiff's employer with a crucible of such strength, durability and quality that it could contain and safely carry the designated capacity of such crucible without the bottoms of said crucible falling out.
(b) In failing to supply plaintiff's employer with crucibles of such strength, durability and quality that same would not become defective before the designated average life of such crucible could be reached.
(c) In failing to sufficiently test the strength, durability and quality of the crucibles to be used by the plaintiff's employer with the defendant's induction melting unit so as to ascertain that same would be safe under all conditions of ordinary and regular usage.
(d) In failing to notify the plaintiff's employer and/or the plaintiff that the said crucibles were subject to bottom failure.
(e) In failing to inform the plaintiff's employer and/or the plaintiff that the said crucibles were known to be subject to bottom failure.
(f) In failing to provide crucibles which when heated would disclose cracking of same so that the said crucibles could be discarded before endangering the life of persons in or about the vicinity of the place where the said crucibles were being used.
(g) In failing to provide a design for a shank which would safely support the bilge crucible bottom so as to prevent the same from dropping out when placed into ordinary and contemplated usage.
(h) In approving and permitting the use of a shank of negligent design.
(i) In approving and permitting the use of a shank which was known to the defendant as being insufficient or inadequate to properly support the said crucible, and particularly the bottom thereof, so as to prevent the crucible bottom from dropping out while in ordinary and contemplated usage.
(j) In failing to notify and/or to supply the plaintiff's employer and/or the plaintiff of the design of a shank known to defendant to be sufficient and adequate to safely support and carry the defendant's crucibles while in use.
(k) In failing to adequately warn the plaintiff's employer and/or the plaintiff of the danger inherent in the use of the defendant's crucibles and/or the shank recommended for usage by the plaintiff's employer with the defendant's induction melting unit.
(l) In advising the plaintiff's employer to continue to use defendant's crucible and/or shank following a reported incident of crucible bottom failure of Oct. 22, 1958, at the foundry room of Superior Kendrick Bearings, Inc., which said crucible was in ordinary and contemplated usage."
Clearly, the complaint alleges, and the proofs ultimately established, that the employees were injured as a direct result *471 of the bottom failure of the crucibles, and it is not disputed that the crucibles were, within the intendment of the policy's exclusion, "goods or products manufactured, sold, handled or distributed by the named insured."
It is conceded, furthermore, that the accident occurred "after possession of such goods or products had been relinquished to others by the named insured," and that such accident occurred "away from premises owned, rented or controlled by the named insured."
What, then, removes this accident from the exclusionary clause? Certainly the fact that the complaints charge Inductotherm Corporation with negligence and that their ultimate liability rested on negligence, does not of itself remove those causes of action from the "products hazard exclusion" contained in the policy. The so-called "products liability" cases, until perhaps recently, were, in the absence of contractual privity of the plaintiff with the manufacturer, of necessity predicated on negligence.
Generally speaking, the negligence customarily alleged in such suits is characterized by an allegation that the defendant negligently omitted to do something, or to perform some act  for example, to properly inspect the product, or to properly manufacture the product.
In Liberty Mutual Insurance Co. v. Hercules Powder Co., 224 F.2d 293, 54 A.L.R.2d 513 (3 Cir. 1955), the court noted that the purpose of a similar "exclusion of products liability clause" was to avoid that type of "products liability" which resulted from the landmark case of McPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (Ct. App. 1916), in which case an automobile manufacturer was held liable to the ultimate purchaser of the car for injuries received by that purchaser resulting from a defect in the car as a result of the negligence of the defendant, arising out of its failure to properly inspect.
In short, in these circumstances manufacturers and suppliers are held liable for injuries resulting from their negligent failure to exercise reasonable care in the manufacture *472 and distribution of their products. However, it is settled that even where the product is properly inspected, designed and manufactured, where foreseeable injury results from the manufacturer's or supplier's failure to "warn" of concealed dangers or of latent limitations in its product, or in the use of its product, such manufacturer or supplier may be held to account for such failure. See Martin v. Bengue, Inc., 25 N.J. 359, 366 (1957), and cases cited therein.
The case of Tidewater Associated Oil Company v. Northwest Casualty Co., 264 F.2d 879 (9 Cir. 1959), involved a suit brought under a comprehensive public liability policy issued to a Tidewater gasoline and oil distributor. That policy contained an exclusion clause relating to products liability. In that case, the plaintiff ordered oil from the insured, and when the oil was delivered the plaintiff requested that the truck driver fill a small can with stove oil which she used to start a fire in her stove. The driver did so, employing a hose which had been recently used to pump gasoline, and when the plaintiff attempted to light her stove on the following day she was severely burned by the explosion which followed. The complaint in that case alleged that the defendant's negligence consisted of: "(1) the use of a hose which contained gasoline * * *; (2) failure to remove gasoline from the hose * * *; and (3) failure to have and maintain on the truck a separate hose to be used exclusively for stove oil."
The insured in that case, as the insured here, asserts that the allegations of negligence were directed to the use of faulty equipment or the negligence of the truck driver, and did "not pertain to a product of the insured or a defect in a product manufactured by the insured." There, as here, a carrier refused to defend on the ground that the causes of action so asserted fell within the products liability exclusion. The court held that the causes of action asserted were not covered by the policy, stating:
"It accordingly appears that each and every circumstance necessary to give application to that part of the exclusion endorsement which relates to products is alleged in the Buffington complaint.
*473 The fact that in addition to these circumstances the complaint alleges that faulty equipment was used or that the truck driver was negligent in certain respects in no sense negatives application of the exclusion endorsement otherwise established. In practically every case in which injury or damage is caused by the handling or use of a product, or by a defective condition in such product, the occurrence causing the injury or damage can be traced to some preexisting negligence. Indeed, were this not so the injured person would have no basis for a tort claim against the insured. Thus, if the allegation of pre-existing negligence were to be regarded as controlling, the result would be to emasculate the product liability exclusion.
* * * In our case, on the contrary, whatever pre-existing negligence may have occurred, the immediate cause of the accident was the handling and use of the insured's contaminated product away from the insured's premises and after the insured had relinquished possession."
Clearly, the allegations in the Michigan suits of some pre-existing negligence on the part of plaintiff, arising out of manufacturing shortcomings or arising out of its failure to warn of a danger inherent in the use of its product, used either alone or as a result of being used in conjunction with a particular shank, are not sufficient to remove these claims from the exclusionary clause of the contract of insurance. Indeed, it is the view of the court that it is this very kind of pre-existing negligence concerning a "product" to which the language of the exclusionary clause is directed and for which policy coverage is expressly withheld, unless, of course, the insured requests such coverage and pays the requisite premium therefor.
With respect to the allegations in the Michigan action of negligence arising out of plaintiff's recommendations concerning the type shank to be used in connection with its crucibles, the fact remains that the allegations are concerned with the failure of the crucible itself and, even assuming that a faulty or improper shank design contributed to the failure, such circumstances would place these allegations within the second paragraph of the "product's hazard" exclusion which excludes from the policy coverage: "Operations, if the accident occurs after such operations have been completed or abandoned and occurs away from the premises owned, rented or controlled by the named insured."
*474 "Operations," as it is employed in the above language, clearly applies to the performance of some act or service in connection with the product manufactured or supplied, either in the sale, distribution or installation of such product.
For example, in Tidewater Associated Oil Co. v. Northwest Casualty Co., supra, the court held that the act of the driver in filling the plaintiff's oil can was an "operation" within the meaning of the clause. Again, in United States Sanitary Specialties Corp. v. Globe Indemnity Co., 204 F.2d 774 (7 Cir. 1953), the act of a salesman in waxing a floor during the course of a sales demonstration of the wax, which was the "product" in such case, was considered to be an "operation" within the meaning of a similar provision.
Here, if plaintiff provided, or recommended, or approved, or permitted the use of a shank of inadequate, insufficient or negligent design, in connection with the installation and operation of its furnace, which shank was to be used in conjunction with the crucibles, such recommendations or approval represented acts or failures to act arising out of "operations," and here the operations had been completed and the accident occurred away from the premises owned, rented or controlled by plaintiff. It follows, therefore, that such allegations with respect to the shank fall within the product's liability exclusion.
Accordingly, under the circumstances of this case, the accident or occurrence, and the negligence alleged to have caused such accident, which formed the basis of the suits instituted in Michigan, fall within the "product's liability" clause of the liability policy and were, therefore, not covered by such policy. There being no coverage, defendant was under no obligation to either assume the defense of the actions instituted in Michigan or to pay or satisfy any judgments against plaintiff resulting therefrom.
A judgment of no cause of action is accordingly entered, and an appropriate order will be submitted.